**In the Matter of STARK, Gerald A. Stark, Cathy C., Debtors.**

**Gerald A. Stark and wife, Cathy C. Stark, Movants,**

v.

**Crestar Mortgage Corporation and Federal National Mortgage Association (FannieMae), Respondents.**

**Bankruptcy No. 95 40300.**

United States Bankruptcy Court, W.D. North Carolina, Shelby Division.

March 31, 1999.

Robert L. Lindsey, Charlotte, North Carolina, for Crestar Bank, Lindsey, Schrimsher PA.

O. Max Garner III, Shelby, North Carolina, for the debtor.

Langdon Cooper, Gastonia, North Carolina, for the debtor.

Steven G. Tate, Statesville, North Carolina, Chapter 13 Trustee.

Keith Johnson, Charlotte, North Carolina, for Fannie Mae.

## ORDER AND FINAL JUDGMENT

MARVIN R. WOOTEN, Bankruptcy Judge.

THIS MATTER coming on to be heard and being heard before the undersigned Judge presiding over the United States Bankruptcy Court for the Western District of North Carolina, Shelby Division, on Friday, February 26, 1999, pursuant to a motion for sanctions filed by the debtor(s) against the respondent(s) named herein for an alleged violation of the automatic stay provided for by Section 362 of Title 11 of the United States Code; and

IT APPEARING to the undersigned that the male debtor was present in person for this hearing and was represented by O. Max Gardner III, that Crestar Mortgage was represented by Robert L. Lindsey, Jr., and that FannieMae was represented by R. Keith Johnson; and

IT APPEARING to the undersigned from the stipulations of the parties and the evidence presented to the Court that:

1. On 05 March 1993 the debtors signed a note and deed of trust with AT & T Federal Credit Union in the sum of $114,750.00. The deed of trust was recorded on 10 March 1993 in Book 1125 at Page 2042 in the Office of the Register of Deeds of Cleveland County, North Carolina. Both

of these documents were introduced into evidence at the hearing. Neither the note nor the deed of trust made any specific reference to any inspections upon the filing of a bankruptcy case or of any charges for such inspections.

2. Paragraph 7 of the Deed of Trust provides as follows:

**Protection of Lender's Rights in Property.** If Borrower fails to perform the covenants and agreements contained in this Security Agreement, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not.have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

3. Paragraph 9 of the Deed of Trust provides as follows:

**Inspections.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

4. Paragraph 14 of the Deed of Trust provides as follows:

**Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

5. The note and deed of trust were assigned and transferred by AT & T Federal Credit Union to Crestar Mortgage Corporation sometime thereafter but before the filing of the Chapter 13 case. At the time of transfer, the debtors received a written letter from Crestar in which they were advised to notify Crestar of any change in their street address, telephone number, or of any structural changes to the residence. They were also requested to advised Crestar if the home was to be vacant for more than 30 days, if they rented the home to anyone for more than 30 days, or if any other similar changes occurred with respect to the home. The letter made no reference to any inspections that could or might be made to confirm or verify any of these matters or of any other changes in the terms and conditions as stated in the note and deed of trust.

6. Gerald & Cathy Stark, the debtors in this case, filed their petition for relief under Chapter 13 of Title 11 of the United States Code on 19 September 1995.

7. An Order for Relief under the provisions of Chapter 13 of Title 11 of the United States Code was duly entered by this court upon the filing of the petition. This Order served to invoke the provisions of Section 362(a) of Title 11 of the United States Code.

8. The plan filed by Gerald & Cathy Stark with their petition included the

mortgage payment to Crestar for the month of September of 1995 in the sum of $989.53 with direct payments to resume in October of 1995.

9. The 341(a) meeting of creditors was held in Shelby, North Carolina, on 16 November 1995. Crestar did not appear by way of any agent, employee or attorney at that meeting. The plan of the debtors was recommended for confirmation by the Trustee at the conclusion of that meeting.

10. The Chapter 13 plan of Gerald & Cathy Stark was confirmed by Order of this Court entered on 08 December 1995.

11. Crestar was duly and properly listed by the debtors on the schedules filed with their petition and on the master mailing matrix filed with this Court.

12. Crestar received actual written notice of this Chapter 13 filing and of the automatic stay from the Trustee, the Clerk of this Court, and the attorney for the debtors. The notice from the attorney for the debtors was received at or about the time of filing and the notices from the Trustee and the Clerk of this Court were received within 30 days thereafter.

13. Crestar has received additional written notices of the filing of this Chapter 13 case since confirmation of the plan.

14. Beginning in January of 1996, Crestar added an additional fee or charge to the monthly billing statement mailed to Gerald and Cathy Stark. This fee or charge was listed under the following designation: "Other Charges." No other description or explanation was given on the statement for these charges. Crestar added the sum of approximately $9.00 per month to this category each month thereafter. As of the filing of the motion for sanctions, the total amount of these charges was $135.00. Specifically, the debtors were charged with one inspection that was conducted in December of 1995, the debtors were charged for twelve inspections that were conducted in 1996, and the debtors were charged with two inspections that were conducted in 1997.

15. The monthly billing statements from Crestar included the following language:

Our records indicate one of the mortgagor(s) has filed for bankruptcy. The due date shown above is the due date for payments under the terms of the original Note. It will not reflect the due date for any repayment plans approved by our office.

16. All of the monthly billing statements from Crestar clearly indicated that the borrowers should call the following telephone number or numbers if they had any questions: (804) 291–0740 or 1–800–552–7951.

17. All of the inspections performed by Crestar in this case were "windshield inspections" and no inspectors ever entered upon the property of the debtors.

18. In October of 1996, the male debtor, Gerald Stark, became concerned about the amount of these "other charges" and as a result placed a telephone call to Crestar at one of the telephone numbers noted on the monthly billing statement. Mr. Stark was advised by the employee of Crestar who answered his inquiry that she "had no idea" what the "other charges" could be, the basis for any such charges, or why the charges had been added to his bill. She promised to have the matter reviewed and get back with Mr. Stark just as soon as possible.

19. Crestar never contacted Gerald Stark in response to his initial telephone inquiry. As a result, Mr. Stark placed a second telephone call to Crestar later in the Fall of 1996. He used one of the same telephone numbers for this call. This time Mr. Stark was advised that the charge related to "some type of inspection" fee but the reason or basis for the inspections could not be determined. Mr. Stark was

advised that a supervisor, Gennie Sparrow, would get back in touch with him about the matter. She failed to do so and no other employee of Crestar made any effort to contact Mr. Stark about this matter.

20. Mr. Stark therefore placed a third telephone call to Crestar sometime thereafter and asked for Gennie Sparrow. After a lengthy waiting period, he talked with Ms. Sparrow and she advised him that the charges at issue constituted a "monthly inspection fee" and that this fee was charged to his account each month because he and his wife were behind on their mortgage payments due to the prepetition arrears included in their Chapter 13 plan.

21. Mr. Stark met with his attorney after this third telephone call to express his concern about the monthly inspection fees and to request the assistance of his attorney in determining if such fees were proper and lawful.

22. As a result of the first meeting with Mr. Stark, the attorney for the debtors wrote a letter to Crestar for a detailed explanation with respect to the monthly inspections fees and charges. The letter was written to Crestar on 20 November 1996 and in fact was received by Crestar. Crestar never responded to the said attorney's letter.

23. Gerald and Cathy Stark never received any prior notice of such inspections, by first class mail or otherwise, and in fact knew nothing about any such inspections at all before the third telephone conversation between Gerald Stark and Gennie Sparrow, the representative of Crestar.

24. Gerald Stark testified at this hearing that since the filing of his Chapter 13 case there have been no changes in his street address, in his home telephone number, in his place of employment, or in his work telephone number. He further testified that he and his wife have continuously occupied their home since the filing of this case, that there have been no lapses in their homeowner's insurance coverage, that they have never rented the home to anyone or to any entity, and that they have had no termination in any utility service to the property since the filing of this case.

25. Gerald Stark further testified that it had been necessary for him to meet with his attorney approximately 6 times about this case; that he had appeared at 3 court hearings, including a hearing in Charlotte; that his gross pay was approximately $2,100.00 per pay period; that he was a salaried employee; that his employer required him to "make-up" any hours missed from work due to this case; and that he would have to make-up approximately 10 to 12 hours of work due to this case.

26. Crestar has admitted in pleadings filed with this Court that it caused the home to be inspected each month and that such inspections were required by the Federal National Mortgage Association (FannieMae). Specifically, Crestar contends that it was acting in accordance with the following provision of a manual prepared by the Federal National Mortgage Associations and entitled **Controlling Default: Bankruptcy Management:**

**Inspect the property.** An on-site inspection of the property should be conducted to immediately ensure that the property is being sufficiently maintained. Throughout the bankruptcy proceedings, continue to inspect the property at least every 30 days. You'll want to avoid any contact with the debtor during the inspection, since that would be in violation of the automatic stay.

If the inspection reveals that the property is vacant and may have been abandoned, make arrangements to safeguard the property to the extent allowed by local laws. If you suspect that the property may be subject to deterioration due to vacancy, immediately contact your bank-

ruptcy attorney to request the court be petitioned for relief from the automatic stay.

**Determine property value.** As early as possible after receiving the notice, determine the value of the property. Generally, an appraisal conducted from the street view is appropriate. Using the result of the appraisal and the mortgage balance, you can determine how much equity the debtor has in the property. If you determine that the debtor has no equity in the property, you should contact your attorney to request that the court be petitioned for relief from the automatic stay. Once the automatic stay is lifted, proceed with foreclosure.

**Contact your attorney.** Shortly after you receive the bankruptcy notice, advise your attorney in writing of the specifics of the case, including the status of the mortgage (amount delinquent, foreclosure action taken if any, etc.). Let your attorney know that you plan to take an assertive and immediate approach to the bankruptcy. If your attorney is unwilling to take swift action in the court, then you should find an attorney who will.

**Highlights of this booklet include.** The filing of a bankruptcy petition creates an "automatic stay" that prohibits all creditors from attempting any contact or collection actions against the debtor while it is in effect. The automatic stay begins on the date the bankruptcy petition is filed, not on the date the notice is received.

Once a repayment plan is approved, it is critical that you closely monitor the collection of both plan (arrearage) and current payments. If the debtor fails to pay two or more consecutive payments or is consistently late (with plan and/or current payments), you may have grounds to obtain relief from the automatic stay.

27. The FannieMae booklet does not include any provision that would mandate, authorize or approve any charge to debtors for monthly inspections in Chapter 13 cases.

27. After the filing of the motion for sanctions in this case, Crestar removed all charges for prior inspections from the monthly statements issued to the debtors.

28. The total amount of monthly inspection charges added to the account of the debtors before the removal thereof was $135.00 (15 inspections at $9.00 per inspection).

29. Crestar has advised this Court that as a result of the fling of the motion in this case it has voluntarily ceased imposing inspection fee charges on all similar properties within the State of North Carolina.

30. Crestar never applied for relief from the automatic stay before conducting any of the inspections or before billing the debtors directly therefore.

31. Crestar never filed any application with this Court for the employment of any person or entity to inspect the residence of the debtors for any purpose.

BASED ON THE FOREGOING FINDINGS OF FACT, THE COURT MAKES THE FOLLOWING CONCLUSIONS OF LAW:

A. The $9.00 monthly inspection fee that Crestar imposed on the debtors in this case was in effect a monthly bankruptcy "monitoring fee." Crestar argues that under the terms of the note and deed of trust this type of fee is authorized. However, the express language of the loan documents does not authorize the imposition of any "bankruptcy monitoring fees" but applies more generally to attorneys fees and other costs of defending the mortgage in a court action. This "monitoring fee" is therefore an "unbargained-for term" in these loan documents.

B. The loan documents in this case also provide that in order to conduct an "in-

spection" of the property the lender must give the borrower reasonable notice in writing of the time and date for any inspection and of the reasons for the same. No such notice was ever given in this case.

■ C. The language in the note and deed of trust is at best ambiguous as to the right of the lender to conduct these inspections and to charge a fee for the same. It is a basic principle of contract law that any ambiguity in a contract is to be construed against the drafter, in this case the lender. Equally important, courts have strictly construed contractual provisions providing for the recovery of fees and costs. The court therefore concludes that although the lender is free to "ride-by" the residence of the debtors on a public street as it deems reasonable to "view" the property it does not have the right under the contract to otherwise inspect the property without notice and has no authority to charge any type of fee for any type of bankruptcy "inspections."

■ D. Since Crestar attempted to collect these "inspection or bankruptcy monitoring fees" from the debtors while the stay was in effect, by adding the fees to the debtors' monthly statements, Crestar violated Section 362(a)(3). This section prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" while the stay is in effect. And, under Section 1306, property of the estate in a Chapter 13 case includes all property acquired by the debtors after commencement of the case and all earnings from services performed by the debtors after commencement of the case. By seeking these payments directly from the debtors, Crestar violated the automatic stay.

■ E. Crestar should pay the sum of $500.00 in damages directly to the debtors for the stay violation in this case.

F. Crestar should pay the sum of $1,250.00 in legal fees and expenses to O. Max Gardner III for the violation of the stay in this case.

■ G. Although Crestar violated the automatic stay in this case, the circumstances of the violation are not appropriate to justify the award of any punitive damages.

■ H. The motion for sanctions against FannieMae should be dismissed since the instructional manual from FannieMae to Crestar specifically indicate that no collection efforts should be directed against the debtors because of the automatic stay and furthermore neither suggested nor required the imposition of any inspection fee or charge to debtors in these circumstances.

**IT IS THEREFORE SO ORDERED.**